(35 South. 792.)

No. 14,227.

S. A. TRUFANT COMMISSION CO. v. YA-
ZOO & M. V. R. CO.*

(Nov. 3, 1903.)

WAREHOUSEMAN—STORAGE OF WHEAT—CON-
TRACT—CONSTRUCTION—NEGLECT OF WARE-
HOUSEMAN—DAMAGES.

1. In October, 1891, the plaintiff obtained
from the defendant the right of transferring
through the elevator of the railroad company
25,000 bushels of grain, the defendant agreeing
to reserve space for it for the purpose, and to
take care of and handle that quantity of grain
in the elevator, under the rules and regulations
adopted by it; but this right was granted under
the correlative obligation assumed by the plain-
tiff that it should keep the quantity of grain
contracted to be received "constantly on the
move." It was understood and agreed that the
elevator was not to be employed as an ordinary
storage place or warehouse, but was to be used
as incidental to the business of the defendant
as a common carrier in aid of the export to Eu-
rope by shipping of the grain brought by its
road. Defendant received and placed in its ele-
vator a quantity of grain belonging to the plain-
tiff in transitu to Europe. The grain was grad-
ed No. 4 wheat by the New Orleans inspectors,
but No. 3 by those at St. Louis. No. 4 wheat
was not in demand at that time, and plaintiff,
after a consultation with the New Orleans in-
spectors, to which defendant company was no
party, determined to send to the West and pur-
chase No. 2 wheat, which, being mixed with the
No. 4, would bring that wheat up to No. 3.
Plaintiff met with obstacles in the way of
purchasing No. 2 wheat, but finally bought and
had brought to New Orleans a quantity of wheat
of that grade. When it reached New Orleans
it was found that the grain in the elevator was
so weevil-eaten and buggy as to cause it to fall
below No. 4 wheat, and to cause it to be desig-
nated as "no grade wheat," which could not be
brought up to No. 3 grade by mixing it with the
No. 2 which plaintiff had brought down. The
mixing was abandoned, and the wheat in the
elevator and that brought down for mixing
were shipped to Europe and sold at a loss.
Plaintiff received the wheat in the elevator
under protest, contending that defendant had
failed in its obligations, and was liable to it in
damages for its condition. During this period
plaintiff made no attempt to ship the wheat
which was in the elevator. Plaintiff sued the
defendant for damages it received by reason of
the condition of the wheat in the elevator.
Held: That the plaintiff was itself to blame
for the situation. It failed to have the wheat
promptly shipped, as was its duty, and while
seeking to minimize its own loss it forced upon
the defendant the obligations of holding the
wheat until late in the season, during which in-

*Rehearing denied February 1, 1904.

terval it deteriorated and fell below grade in
spite of proper care being taken of it. The
weevily condition was not traceable to its be-
ing in the elevator, but was due to causes ante-
dating its being placed therein, and weevils
would doubtless have developed in it had it
been promptly placed on ship and forwarded.
The loss on plaintiff's sales was not due to any
fault of the defendant. The character of the
wheat was not changed while in the cars by rea-
son of being side-tracked in New Orleans. The
New Orleans grading is more severe than that at
St. Louis.

2. While it would have been the duty of the
plaintiff, had defendant been liable to it, to
have minimized the damages in the premises, it
could not throw upon defendant any increase
of loss resulting from an injudicious attempt
to bring about that result on its part. The de-
fendant had nothing to do with that matter.
The New Orleans inspectors were not author-
ized to act for the defendant by way of advice
or otherwise.

(Syllabus by the Court.)

Appeal from Civil District Court, Parish
of Orleans; Fred D. King, Judge.

Action by the S. A. Trufant Commission
Company against the Yazoo & Mississippi
Valley Railroad Company. Judgment for
defendant and plaintiff appeals. Affirmed.

Denègre, Blair & Denègre, for appellant.
Gustave Lemle and Hunter C. Leake (J. M.
Dickson, of counsel), for appellee.

Statement of the Case.

NICHOLLS, C. J. The plaintiff prayed for
judgment against the defendant for $6,135,
with legal interest thereon from the 1st of
December, 1892, until paid. In its petition
the plaintiff alleged: That it was engaged
in the commission business and grain busi-
ness, handling large quantities of grain in
the West, which it shipped to and through
New Orleans for sale. That it was particu-
larly well known to be engaged in such busi-
ness by the Louisville, New Orleans & Texas
Railway Company, all of whose property and
obligations had been transferred to and as-
sumed by the defendant, which was its suc-
cessor.

That in the regular course of its business
during the fall of 1891, in anticipation of the
business of the coming season, it applied for
and obtained from the Louisville, New Or-
leans & Texas Railway Company, through
its general traffic manager, E. W. How, the
right of transferring through the elevator of

said railway company in the city of New Orleans 25,000 bushels of grain, said company agreeing that it would always and at all times have that capacity at the disposal of petitioner, and always and at all times take care of and handle that quantity of grain for it, under the rules and regulations adopted by it and published.

That upon said agreement petitioner made contracts for the sale of grain during said season of 1891 and 1892, and purchased large quantities of grain in the West for shipment to and through the said elevator in New Orleans, the sales and shipments having been made on the faith of and in reliance upon the said agreement. That up to the 15th day of April, 1892, it sustained no loss. That subsequent to said date it suffered loss and damage by reason of the failure of the Louisville, New Orleans & Texas Railway Company to carry out its agreement to keep at the disposal of petitioner room for $25,000 bushels of grain in its elevator, and the failure of said company to transfer from cars to the elevator, take care of, and handle in said elevator the grain shipped by petitioner to said elevator, within said guaranty, to the extent of 25,000 bushels. That by reason of said company's overcrowding its elevator, and giving to others the room allotted to it, and not promptly receiving into its elevator under said agreement, it allowed a large number of petitioner's cars of wheat to remain on the side track and in its yard for a long time, and at the date when, owing to the weather conditions then prevailing, it was to the knowledge of said company dangerous and negligence of the highest character to allow the wheat to remain in the cars on the side tracks and in the yards, said wheat being thereby to its knowledge likely to deterioration and to loss in value.

Petitioner annexed to its petition an Exhibit A, which it declared showed by numbers the cars of wheat which defendant permitted to remain on its tracks and in its yards, together with a statement of the quantity of wheat contained therein.

It averred that said wheat was known as No. 3 wheat, which it had sold at the rate of 82½ cents per bushel, and was well worth said sum in the city of New Orleans, but that, owing to the negligence and delay of the defendant company in unloading these cars into its elevator, the wheat, by reason of its exposure and the length of time it was allowed to remain upon the tracks and in the yards, suffered, and was graded by the inspectors as No. 4 wheat.

That during said season and at the time aforesaid the demand was for No. 3 wheat, there being no demand for No. 4 wheat or other grades of wheat, and all of the wheat passing into and through said elevator was of No. 3 grade. That subsequently, on the 15th of April, 1893, defendant company, well knowing this fact that there was no demand for No. 4 wheat, and that all the wheat it had in its elevator, or which was likely to be handled therein, was of No. 3 grade, as a matter of protection to itself notified petitioner in writing that it would not handle in its elevator any No. 4 wheat, and petitioner relied upon this notice, and also upon the custom and usage of said elevator to notify petitioner and its other patrons whenever any of their wheat misgraded. That under said notice and the custom aforesaid it became the duty of defendant company to notify it that certain cars of wheat belonging to it were claimed to have misgraded, in which case, as was well known to defendant, it had the right to appeal from the decision of the inspectors and call for a reinspection, and had the right of demanding that its said wheat be placed in special and separate bins, but defendant company, in violation of its aforesaid notice and its well-established mode of dealing, upon which petitioner relied, and without giving it a chance of appealing from the decision of the inspectors, and without petitioner's knowledge, unloaded and delivered into the elevator all of petitioner's wheat which had been graded by the inspectors as No. 4 wheat.

That, having received notice of the misgrading of its cars of wheat, it immediately exercised its right of appeal from the decision of the grain inspectors, which appeal was rendered of no avail by the unloading of the cars aforesaid.

That its said appeal was made before it had any notice or knowledge of any kind that its said cars of wheat had been unloaded in the elevator, and as soon as petitioner was so informed it protested against the action of the defendant company. Petitioner averred that its wheat was of excellent qual-

ity, and a reinspection of the highest importance.

Plaintiff annexed to its petition an Exhibit B, which it declared contained a list of the cars of wheat which it alleged had been misgraded and graded No. 4 instead of No. 3, and which it averred had been unloaded into the elevator by defendant company contrary to its notice and agreement.

It alleged further that, there being no demand that season for No. 4 wheat, it became necessary for its own benefit as well as that of the defendant company, in order to decrease any loss which might be entailed by the negligent acts of the defendant, to do all in its power to dispose of the wheat to the best advantage, and that the only way in which it could be disposed of to advantage at the time was by bringing down from the West sufficient wheat grading No. 2 to enable the aforesaid No. 4 wheat, when mixed with No. 2, to grade No. 3. That, therefore, acting in the best interest of all concerned, and to decrease the damages, after consultation with the grain inspectors at New Orleans, it purchased in the West and shipped to New Orleans some 12,000 bushels of No. 2 wheat, which wheat (with the exception of two cars, containing about 1,600 bushels) reached the city of New Orleans. Said two car loads disappeared, and could never be traced up by the railway company, which paid for the same.

It alleged that when said wheat No. 2 reached New Orleans it was found that the wheat in the elevator which defendant offered to deliver to petitioner for the wheat of petitioner which it had received into its elevator was not No. 4 wheat, but buggy and weevily "no grade" wheat. That, had the defendant company delivered the wheat which it had received into its elevator, and in the condition in which it received it, or even other wheat which graded No. 4, it would have been able, by mixing said No. 2 wheat with the No. 4 wheat, to turn the whole out as No. 3 wheat, and to sell the same as such, thereby sustaining a loss which would have been much smaller than the actual loss. That by reason of the circumstances petitioner was compelled, to avoid any further loss and decrease the damage as far as possible, to receive under protest the buggy and weevily "no grade" wheat offered by the defendant, and dispose of the same and of the No. 2 wheat in the manner which it thought best calculated to decrease the damage, and this it could only do by shipping the same as it did to Europe, realizing therefrom only the sum of $15,245. It averred further that the buggy and weevily wheat delivered by defendant was not that belonging to petitioner which had been placed in the elevator, and, if any portion thereof was petitioner's wheat, its buggy and weevily condition was due to defendant's negligence and fault. It further averred that defendant compelled it to pay storage on the wheat which was the subject of the suit, and it had no right to make such charge, first, because the detention of the wheat in said elevator was due to its negligence and fault in keeping it upon the side tracks until it lost its grade; second, because the company did not charge any one else, and had established a rule or custom making no such charge, upon which they relied; and defendant as a matter of fact charged no one else, but made a charge against it because of the advancing of its claim for compensation for their negligence and wrongdoing; that it paid the same under protest, and in order to obtain possession of the wheat, the amount so paid being $653.

Defendant, after pleading the general issue, admitted that during the month of October, 1891, the plaintiff obtained from the Louisville, New Orleans & Texas Railway Company, through its traffic manager, the right of transferring through its elevator at Southport 25,000 bushels of wheat under the rules and regulations adopted by said company and published. It averred that at the time said right was acquired it was understood that it was for the purpose of transferring grain for export shipment, and that said elevator would not be used as a warehouse for the storage of wheat and grain for an indefinite period of time, or for the mere convenience of shippers. It denied that it allowed cars of wheat belonging to plaintiff to remain on its tracks or in its yard any unusual length of time, or that the deterioration in said wheat, if any (which was denied), took place as a consequence of its being left in the yards or on the side tracks of the respondent company, and averred if said wheat deteriorated it was due to its inherent vices and other causes for which

respondent could not be held liable. Defendant averred that its elevator was of limited capacity, and it was essential that the wheat and other grains passing through it should be transferred quickly, and not permitted to remain in the same; that on April 15, 1892, finding that there was little demand for No. 4 wheat, through its traffic department it issued the following notice to all its patrons, and particularly to plaintiff:

"I beg to notify you that we will not handle any No. 4 wheat you have on tracks until such time as we can do so without loss to elevator." That plaintiff made no protest or objection to said notice, but, on the contrary, acquiesced therein and consented thereto.

It averred: That it unloaded No. 4 wheat into its elevator whenever it could do so without loss. That plaintiff made no request not to do so, except in one instance, and made no formal protest against its being done at any time. That the 25 cars of wheat referred to in plaintiff's petition and graded No. 4 wheat were unloaded into elevator as follows: 5 cars on May 13th, 2 cars on May 14th, and 15 cars on May 15th; and plaintiff had full knowledge of the unloading of each of said cars on the day it was unloaded, or the next morning at the latest, and plaintiff had notice that No. 4 would be unloaded under the rules of the elevator into the elevator whenever it could be done without loss to the elevator, and made no formal protest or objection thereto, and made no request not to unload the same, except in the matter of three cars which were received at Southport on May 30, 1902, graded No. 4, which plaintiff requested should be held until the grain committee examined same, which was done. That the grain committee sustained the inspection as No. 4, and the wheat was unloaded on June 4th into the elevator. That at the special request of the plaintiff it was put into a separate bin, and kept separate and by itself during the time it was in the elevator, and it was on the 16th of July loaded on board the steamship Glendoig in sacks. Defendant averred: That while the wheat was in the elevator it took all the care of it that a prudent warehouseman could have done, and, if it became weevil-eaten or buggy, it was due to no neglect of respondent, but rather to the negligence and delay of plaintiff in not removing same. That the 25 cars of wheat referred to in plaintiff's petition were loaded (in bulk) on the steamship Glendoig on the 16th of July, 1892, less 2,807 bushels, shipped on the Thomas Melville, and 1,897 bushels, shipped at the same time on that ship in sacks. That it had nothing to do with the loading of said wheat or the shipment or sale of the same, and could not be held liable in damages for any damages growing out of the shipment and sale of the same. It denied that of all its patrons it collected storage alone from the plaintiff, and as a matter of fact it charged storage and made demand upon every one who used the elevator according to the published tariff rules. It specially denied that it was guilty of any fault or negligence, or that it was liable for any loss of the plaintiff. It pleaded the prescription of one year in bar of plaintiff's action.

The district court rendered judgment in favor of the defendant against the plaintiff, rejecting its demand, and plaintiff appealed.

### Opinion.

Counsel of the plaintiff, in the presentation of their client's case, bring prominently forward the obligation assumed by the defendant of retaining at all times space sufficient in its elevator to accommodate 25,000 bushels of its wheat, but withdraw practically from consideration the correlative duty and obligation which it had itself assumed, which was the basis and condition of the privilege granted it—that it should keep that quantity of grain "constantly on the move." It was a matter well understood—in fact, a matter of agreement—that defendant's elevator should not be utilized for storage purposes to suit the wishes or interests of the plaintiff, but it should only be incidentally employed in aid of or as adjunct to defendant's obligations as a common carrier, in receiving in bulk from its cars and delivering in bulk to ships at the wharf through its elevator shipments of grain from the West in transfer for export from New Orleans to Europe. The contract between the parties, so far as the elevator was concerned, was not one for storage, though as a matter of fact storage did result from subsequently existing conditions. In a letter of traffic agent of September 24, 1891, to the plaintiff, he

wrote: "I believe you are fully familiar with the terms upon which we have been making engagements of this kind during this season. We set aside a certain quantity of room with the understanding that the parties with whom we make contracts shall keep that quantity of grain constantly on the move and reserving the privilege of canceling the contract after giving reasonable notice whenever the room has been kept unnecessarily long in our hands."

On the 28th of September the plaintiff answered: "Our friends have large contracts and will dovetail in so as to relieve the Elevator at all possible opportunity. In other words with the large business they are doing and the large amount of freight room they have under contract they are in position to put a vessel to the Elevator at almost any moment and thereby relieve the Elevator which would be a great advantage to you as the shippers that you have already made contracts with will probably have to hold special lots of grain to meet special freight arrangements." On October 31st defendant's agent wrote plaintiff: "I was in hopes that you fully understood the terms of our arrangement with respect to business passing through the Southport Elevator. We have set aside for your particular use room for 25,000 bushels and if your arrangements are such that you can take care of it so far as the ocean room is concerned, you are at perfect liberty to use this amount of room once or twice each week. You understand that this is not intended to convey the idea that we have extended the amount of room set aside for you, but you can fill and empty that space as often as you can make the necessary arrangements to do so."

The importance of bearing in mind this obligation of the plaintiff to provide for the prompt shipment of its cars of grain in ascertaining the weight to be given to its complaint is manifest. The record discloses no attempt on its part to furnish shipping for the transportation of the grain, and no demand for the delivery of the same from the elevator for that purpose prior to the 16th of July, 1892, a period of 60 days from the receipt of the same by the defendant into the elevator. Not only was there no attempt made during this time to ship the grain, but there were no special instructions given to

defendant as to any particular disposition to be made of the wheat in the elevator, nor any offer to withdraw it from the same to some other place.

Plaintiff says that when it made a demand on the defendant on the 16th of July for delivery for shipment by the Glendoig the wheat tendered it was not its wheat, nor No. 4 wheat, but "no grade" wheat, weevily and buggy, which it at first declined to receive, but finally accepted under protest, and sent the same forward in bulk by the Glendoig for sale in Europe, where it was in fact sold. It contends that defendant was not justified in offering it the wheat which it did, nor wheat of the character offered; that it was entitled to have had tendered its own wheat, and of the same character which it had turned over to defendant.

The plaintiff was at fault itself in not providing promptly, as it had agreed to do, for the shipping of the grain. Its leaving it uncalled for for so long a time was unwarranted, and it was itself to blame for the consequence of the course pursued. It was its duty to have fulfilled its own obligation and made due demand upon defendant for the fulfillment of theirs, and forced an issue within a reasonable time upon the defendant.

Had it done so, we have no right to suppose that defendant would have tendered to it wheat already weevily and buggy at that time. We have no right to suppose from anything shown by the record that the existence and presence of weevils in the wheat at a later period were due to anything done or omitted to have been done by the defendant in the interval. The testimony in the record shows that the weevils were due to causes which antedated the receipt of the wheat in the elevator, and that they would have developed in the wheat even if it had been delivered before to the plaintiff; that, had it been received in due time on shipboard, it would have been affected before it reached Europe for sale.

The plaintiff having given no special instructions to the defendant as to the wheat or attempted to withdraw it, defendant (until it was called for) seems to have taken all proper care of it. If it failed to do this, it was not shown on the trial wherein it did so. Plaintiff says that as soon as it ascertained

that the wheat had been unloaded into the elevator after having been graded as No. 4 wheat by the New Orleans inspectors it consulted with the latter, and at their suggestion it sent on to Missouri to purchase No. 2 wheat, so as to raise the grade of the wheat in the elevator to No. 3 from No. 4 by mixing them together, but that when the No. 2 wheat reached New Orleans it found that the wheat in the elevator had become weevily, and it was impracticable to do this, and it had to ship the wheat in the elevator in bulk to Europe for sale, and the No. 2 wheat separately; that the action taken by it in this matter was to attempt to minimize the loss upon the wheat in the elevator.

The plaintiff had the right to consult with the grain inspectors at New Orleans, if it thought proper, as to the course it should pursue in reference to its shipment of wheat, but the grain inspectors were not in any manner the agents of the defendant, and nothing they suggested in the premises, or upon which plaintiff may have acted, had any bearing upon defendant's rights or obligations.

The defendant, as a common carrier, had nothing whatever to do with the system of grain inspection or the grading of grain. That system was purely a voluntary conventional one, organized in the interest of grain dealers, and to aid and regulate their business relations between themselves.

Plaintiff urges that its sending for the No. 2 wheat and holding the wheat in the elevator back as long as it did was in the interest of the defendant, and to minimize loss. That may have been the motive of its action, but it was a matter as to which defendant was not consulted, and by which it was not bound, and as to which it was not at all concerned under the facts of the case, for it was responsible for no loss whatever, whether great or small. Had it been in fact responsible for the loss, it would have been commendable in the plaintiff to have sought to reduce it; but while a reduction of loss under such circumstances would have inured to its benefit, plaintiff could not charge defendant with any increase in the loss resulting from an imprudent or injudicious attempt to bring about a different result.

Plaintiff contends that defendant was at fault as a common carrier in delaying delivery as long as it did of the grain to the elevator after reaching New Orleans, and holding it in close cars on its side tracks until such delivery was made in very hot, damp weather. It asserts that by reason of said acts its wheat suffered and was graded No. 4 by the inspectors in New Orleans. There may have been some delay in unloading the wheat into the elevator, but the evidence does not sustain the claim that by reason of that fact and the side-tracking of the cars the character of the wheat was altered from that which it had when it left Missouri. It is true that it was graded lower in Louisiana than it had been by the Missouri inspectors, but the testimony discloses that the grading is more severe and rigid here than in Missouri. The correctness of the grading by the Louisiana inspectors is supported not only by certificates, but by the evidence of the inspectors themselves, and the defendant is not bound by the certificates of the Missouri inspectors. The delay in delivering the wheat to the elevator of itself carried with it no resulting injuries to plaintiff, for, had it been delivered earlier, the situation would have been in no wise altered from that which it would otherwise have been. · Plaintiff was not prepared to ship the wheat in that interval, and it is not pretended that any sale was lost. Plaintiff charges that the wheat was injured in the passage to New Orleans by the leaking of the cars, but no such cause of complaint was assigned in its petition, and whatever testimony there is in reference to leaky cars did not apply to the cars in which this particular wheat was carried. And, besides, all testimony on the subject was objected to by defendant as not being covered by the pleadings, and was admitted subject to the objection urged, which was well founded.

Plaintiff complains that defendant should not have placed the wheat in the elevator without giving it prior notice of its intention to do so, but we find nothing in the contract between the parties which made any restriction upon defendant as to the character of the grain which it was called on to receive for the plaintiff. Defendant itself, for its own protection against undue detention in its elevator of wheat not called for in the market, claimed the right of declining to receive No. 4 wheat, except when it could do

so without loss to itself; but the duty of the defendant to give notice to plaintiff was rather when it refused to receive than when it was willing to receive such wheat. The assigned reason for this complaint is that, had it been notified, it could have demanded an appeal to the board from the inspection of the individual inspectors; but we do not see why the wheat in the elevator could not have as well been reinspected there as in the cars, nor why, being in the elevator, it could not have been taken out and stored in any manner which plaintiff might demand. We have no reason to suppose that plaintiff intended to take an appeal, or to believe that, had an appeal been taken, the grading of the inspectors would have been reversed. Plaintiff's own pleadings claim that there was a change in the character of the wheat from that which it had been in Missouri, though it lays the blame of the change upon the defendant by side-tracking the cars. Its conduct indicated acquiescence in the Louisiana grading, for it at once, on learning of the same, set to work, after consultation with the inspectors, to have recourse to measures to bring the grading of the wheat up to No. 3. Its doing this is evidence that at that time the wheat had not lost its identity in the elevator. The district judge, complying with the spirit and evident purpose of the statute requiring judges to assign their reasons for judgment, accompanied his decree in this case by written findings of fact and conclusions, which have greatly assisted and facilitated this court in its labor, and which we find by a study of the record to have been fully correct.

For the reasons herein assigned it is ordered, adjudged, and decreed that the judgment appealed from be, and the same is hereby, affirmed, with costs.